**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

KENNETH D. MURRY                                                              PLAINTIFF

v.                                        No. 4:11CV00368 JLH

ENTERGY ARKANSAS, INC.;
and ENTERGY SERVICES, INC.                                          DEFENDANTS

<u>**OPINION AND ORDER**</u>

 Kenneth Murry filed this action against Entergy Arkansas, Inc., and Entergy Services, Inc., alleging that the defendants discriminated against him based on his race and retaliated against him for complaining about race discrimination in violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000 *et seq.* The defendants have filed a motion for summary judgment, and Murry has responded. For the following reasons, the defendants' motion for summary judgment is denied in part and granted in part.

**I.**

 Murry, an African-American, began working in Entergy Arkansas's Transmission Line ("T-Line") Department as a Lineman's Apprentice in 2002. Doc. #13. Between 2002 and 2006, Murry was promoted all the way up to Journey Lineman. *Id.* In late 2006, Murry applied for a position as an Associate Engineer in the T-Line Department. Doc. #25. In December, Murry interviewed with Audie Foret who was the T-Line Manager for the state of Arkansas. *Id.* Foret selected Murry, and subsequently promoted him to Operations Coordinator. *Id.* Murry's duties primarily entailed coordinating with work crews to maintain the T-Lines and coordinating the work of outside contractors. *Id.* Murry worked in Entergy's Little Rock office and reported to Foret until approximately June of 2009 when Foret became Regional Manager for the Southern Region of Arkansas. *Id.* At that point, Murry began to report to Foret's replacement, Monty Harrell. *Id.*

As Murry's direct supervisor, Foret was responsible for completing Murry's annual performance evaluations.  *Id.*  Exempt employees, like Murry, are not entitled to annual raises.  *Id.* Rather, such raises are based on merit and depend, in part, upon each employee's performance evaluation ratings and contributions.  *Id.*  An employee rated as "Improvement Required" will not receive a bonus or a raise.  *Id.*  Because of Murry's performance evaluations' ratings in 2008, 2009, and 2010, he did not receive a raise or bonus for those years.  *Id.*

In 2007, Foret gave Murry a generally favorable performance evaluation and rated him a "Valuable Contributor," but noted that Murry needed to work on his communication with team members.  *Id.*; Doc. #12-7.  Foret commented in the evaluation that he had discussed Murry communications issues with him on several occasions in 2007.  Doc. #12-7.  In 2008, Foret found several performance issues in Murry's evaluation and gave him an "Improvement Required" rating. Docs. #25, #12-8.  The evaluation states that Murry met only three of eight goals; he failed to meet the safety, personnel, ECI, reliability-grid, and field presence goals.  Doc. #12-8.  According to the comments on the evaluation, Murry failed to meet his target safety goal because he failed to request a "hot line hold" on a transmission line on which a contract crew was working, on and had taken a "hot line hold" while not being on-site.  *Id.*  The evaluation indicates that Murry did not meet the personnel goal because he shared information from staff meetings with crew members which unnecessarily created conflict and concern.  *Id.*  Foret testified that he asked those in staff meetings to keep the information confidential.  Doc. #12-2.  The evaluation indicates that Murry did not meet the ECI goal because he failed to document or commence projects approved by Foret.  Doc. #12-8. The evaluation indicates that Murry did not meet the reliability-grid goal because he failed to complete outage follow up in a number of cases, failed to complete updates to "TCOS," and would

2

travel several hours to inspect a line even though co-workers who could perform the inspection were closer. *Id.* Additionally, the evaluation states that Murry failed to keep his work group appraised of his plans or location. *Id.* Finally, the evaluation indicates that Murry did not meet the field presence goal because he failed to complete safety observation forms. *Id.*

Foret also stated on the evaluation that Murry was tardy to staff meetings; did not interact well with coworkers; was minimally competent in company policies, practices, and procedures; had organizational problems; would take a long time to perform jobs which should require little effort; did not listen well to his customers; did not know who his customers were in relation to the job; failed to consider the big picture when making decisions; tended to be negative; resisted changes to company methodologies; was not a good listener; did not share information; had poor communication skills; was a source of disruptive gossiping; did not respond well to constructive feedback; and would lose his composure during conflict.[1] *Id.* Regarding the communications issue, Foret specifically noted that Murry had poor written and verbal communication skills, would submit emails with pictures attached but no explanation, would forward emails without commenting or providing input, and would not listen well. *Id.* Foret commented that Murry and he had discussed Murry's need to improve his communications, and that they had agreed to focus on this area. *Id.*

In response, Murry testified that many of the communication issues with his white co-workers resulted from their refusals to respond to his requests to swap shifts or return his emails and calls. Doc. #26-2. Murry explains that he drove long hours to perform inspections because co-workers

---

[1] These latter concerns were documented in the "System Competencies" section of the performance evaluation. Doc. #12-8. Harrell explained in his testimony that this section covers the supervisor's evaluation of how well the employee met his goals and involves subjective determinations. Doc. #26-5.

who may have been closer would not respond to his requests for assistance. *Id.* Furthermore, Murry contends that there is no company rule requiring an operation coordinator to be on-site during a hold. Doc. #26-2. Murry concedes that while he may have shared some information from staffing meetings with crew members, but he says that there is no company rule requiring that such information be kept confidential. *Id.* Murry further denies was ever told to keep the discussions in the staff meetings confidential. *Id.* Murry also testified that it was common place among his co-workers not to complete outage follow-up and updates to "TCOS." *Id.* Murry testified further that he never failed to request a "hot line hold." *Id.*

Foret testified that, based on the 2008 evaluation, Murry was placed on a performance improvement plan in 2009. Doc. #12-2. Murry, however, states that he was not informed of any performance improvement plan until 2010. Doc. #26-1.

Similarly, Murry's 2009 performance evaluation noted various problems and rated Murry as "Needs Improvement." Doc. #12-10. Harrell, Murry's new supervisor, completed the evaluation. Entergy contends that, except for one conversation Foret had with Harrell in 2009, Foret had no input on the evaluation. However, Murry states that Forest sent him a copy of an interim evaluation near the end of August indicating that he was still involved in the formulation of the final evaluation. Doc. #26-1. Further, Harrell testified that he discussed the final evaluation with Foret in early 2010, and admitted that some of the comments in the evaluation were from Foret. Doc. #26-5. In fact, the evaluation refers to supervisor comments as "Foret/Harrell Final." Doc. #12-10.

Unlike in 2008, Harrell found that Murry satisfied all seven goals in his 2009 performance evaluation. *Id.* However, the evaluation indicates that Murry had incidents of failing to comply with certain safety rules; did not admit to his mistakes or take constructive criticism and tended to make

4

excuses, blame others, and argue about other problems unrelated to the subject of the criticism; failed to keep information from staff meetings confidential; was not viewed as a team player; had problems with time management; failed to provide for needed materials and equipment for assigned crew; had a low level of customer satisfaction; had conflicts with supervisors of crews assigned to him; and was a source of gossip. *Id.* The evaluation states that Murry needs to continue working on his communications skills. *Id.*

As with his 2008 evaluation, Murry disputes the factual bases of some of these criticisms or contends that Harrell and Foret unfairly held him solely responsible for problems for which his co-workers were primarily responsible. *Id.*; Doc. #26-2. Specifically, Murry reiterates his complaint that his white co-workers would not return his emails or calls. Doc. #26-10. Murry points to testimony by Harrell conceding that some of Murry's white co-workers would neglect to respond to Murry's communication requests. Doc. #26-5. Harrell also testified that he did not discuss these communication failures with the other employees or include them on those employees' performance evaluations. *Id.* Murry also questions how Harrell could find that Murry met or exceeded all his goals, and yet also given Murry so many low competency scores. Doc. #12-10.

Finally, Murry's 2010 evaluation also rated him as "Needs Improvement." Doc. #12-11. This evaluation was performed by Jeff Guy.[2] *Id.* According to the evaluation, Murry did not meet his compliance, efficiency, financial, and customer focus goals. *Id.* The evaluation indicates that Murry failed to meet his target compliance goal because he failed to complete a task assigned him to rewrite some of Entergy's transmission maintenance standards. *Id.* The evaluation states that Murry failed

---

[2] As discussed further below, Murry had a new supervisor because he had been transferred into a newly created department within Entergy Services.

to meet his target efficiency goal because he did not participate on any "ECI" projects.  *Id.*
According to the evaluation, Murry failed to meet his target financial goal because he did not
complete and invoice wood pole inspections for Louisiana.  *Id.*  The evaluation indicates that Murry
failed to meet his target customer focus goal because he relied solely on email to contact customers,
did not follow up with customers, and used an abrupt and inappropriate tone in some of his emails.
*Id.*

In the "System Competencies" section, Guy wrote that Murry showed a lack of respect for
stakeholders and other employees; required considerable supervision or assistance on routine
assignments; failed to make any suggestions to reduce costs or increase revenues; demonstrated poor
organizational skills and time management; failed to complete assignments and produced poor work
results; interacted poorly with customers and received negative customer feedback; made poor
decisions and failed to consider the "big picture;" initiated and participated in conflicts within the
work group; lost his composure during conflict and took professional disagreements personally; failed
to respond to constructive feedback and acted disrespectfully to management; did not work well as
a team player and failed to value the opinions of others; resisted changes; did not listen well and had
poor written and verbal communication skills; and was a source of disruptive gossip.  *Id.*  Regarding
communication, Guy commented that Murry had significant communication problems with a
contractor, but that Guy did not believe the problem was entirely Murry's fault.  *Id.*

In the "employee comments" section of the evaluation, Murry contends that the 2010
evaluation merely reiterates the criticisms from the prior evaluations and that the statements are
baseless.  *Id.*  He asserts that some of the statements are based on false accusations made by Harrell
to Guy.  *Id.*  Murry asserts that Guy was unable to identify any specific situations where Murry acted

6

inappropriately in his communications with others. *Id.* Murry contends that he invoiced the wood pole inspections late because he was gone on vacation during the inspections and was unable to access his computer because it was being repaired. *Id.* Murry states that other employees refuse to respond to his emails and phone calls giving rise to the communication problems. *Id.*

As a result of his 2010 performance evaluation rating, Murry was placed on a performance improvement plan in March of 2011. Doc. #25. Murry completed all of his goals in 2011 and received a "Valuable Contributor" rating on his performance evaluation that year. *Id.*

In 2009, Entergy underwent a system-wide reorganization. *Id.* This reorganization included the creation of a new department, Transmission and Distribution Asset Management, which was part of Entergy Services and provided services to Entergy Arkansas, Entergy Louisiana, Entergy Mississippi, Entergy Texas, and Entergy New Orleans. *Id.* The purpose of the newly formed department was to provide a centralized entity which analyzed the power distribution system for each utility and developed maintenance plans. *Id.* Mike Vaughan was selected to become the Vice President of the new department. *Id.* In staffing the new department, Vaughn asked LeNoal Hartwick, the Grid Manager in Arkansas, for employees who could fill two substation positions and one transmission position. *Id.* Vaughn asked for a certain employee to fill the transmission position, but Hartwick requested that that employee not be moved because he was the only employee with an engineering degree in Entergy Arkansas's T-Line department. *Id.* The decision was then between Murry and two other white Operations Coordinators. *Id.* Vaughn and Hartwick settled on Murry. *Id.* The defendants contend that Hartwick testified that Murry had indicated that he was interested in "more of a 'desk job,' without using the phrase." Doc. #12-24. Murry denies that he said he

wanted a desk job, and testified that he had only told Hartwick that he was interested in doing some finance related work on Fridays to help with his graduate degree.  Doc. #26-2.

Murry was informed of the transfer on November 17, 2009, and the transfer went into effect on January 1, 2010.  Doc. #25.  In the new department, Murry was assigned to work under Guy.  *Id.* In his new position, Murry's primary responsibility was overseeing the wood pole program.  *Id.* Murry was responsible for determining which poles needed to be replaced and prioritize the lists based on a consideration of various factors.  *Id.*  Murry did not supervise any employees in his new position.  *Id.*  In his new position, Murry was generally not called out in the event of an outage or storm damage except in extreme emergencies.  *Id.*

On December 7, 2009, Murry filed a complaint with Entergy's ethics hotline contending that Foret discriminated against, retaliated against, and harassed Murry on account of his race.  *Id.*  Murry pointed to various instances where Foret said something that Murry found offensive or showed favoritism toward other employees.  *Id.*  The human resources employee assigned to investigate ultimately concluded that the complaint was unfounded.  *Id.*

Entergy maintains a fleet of vehicle for employee use.  *Id.*  In October of 2009, Entergy amended its transportation policy and redefined which would be allowed to take a vehicle home after hours.  *Id.*  An employee may be assigned a vehicle with take home privileges if he is frequently expected to respond to after hours and weekend call outs; or if he works in multiple offices.  *Id.*  An employee may be assigned a vehicle without take home privilege if he drives in conditions that are abusive to personal vehicle usage and or needs to equip his vehicle with specialized equipment.  *Id.* When Murry moved to his new position, he ceased to qualify for a company vehicle.  *Id.*

8

In January of 2010, Murry asked to be transferred to Entergy's Pine Bluff office, which closer to his residence, so that he could lower his transportation costs. *Id.* Guy recommended that the request be denied. *Id.*; Doc. #12-3. John Scott, Guy's supervisor, denied the request. Doc. #25. Murry then sought benefits under Entergy's relocation assistance policy. *Id.* This request was also denied. *Id.*

On June 8, 2010, Murry filed a charge with the Equal Employment Opportunity Commission alleging race discrimination and retaliation. He subsequently amended his charge. Doc. #1. On February 18, 2011, the EEOC provided Murry with a "right to sue" letter. *Id.* Thereupon, Murry commenced the instant action.

## II.

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets this burden, the nonmoving party must respond by coming forward with specific facts establishing a genuine dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477

U.S. at 249, 106 S. Ct. at 2511.  When a nonmoving party cannot make an adequate showing sufficient to establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

### III.

Murry seeks relief pursuant to 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000 *et seq.*  "The elements of a Title VII disparate treatment claim and a § 1981 claim are identical."  *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997).  Claims of racial discrimination in employment are therefore analyzed applying the same standards under both Title VII and § 1981.  *Id.*

Murry contends that his supervisors subjected him to disparate treatment by (1) rating him as "Needs Improvement" in his 2008, 2009, and 2010 performance evaluations; (2) paying him less than similarly-situated Caucasian employees; (3) transferring him to Entergy Services; (4) denying his request to change his work location from Entergy's Little Rock office to the Pine Bluff office; and (5) denying his request for relocation benefits.

Because Murry does not point to direct evidence of discrimination, his claims must be analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Johnson v. AT & T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005) ("Because [the plaintiff] relies upon circumstantial evidence of discrimination, we assess both the Title VII race discharge claim and § 1981 discharge claim using the burden-shifting framework of *McDonnell Douglas*[.]").  Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination.  *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (citing *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007)).  A prima facie case of discrimination requires proof that (1) the plaintiff is a member of a protected

class; (2) the plaintiff met the employer's legitimate expectations; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004), *abrogated on other grounds by Torgerson*, 643 F.3d 1031. The fourth element can be met by proof that similarly situated employees were treated differently. *Id.*

If the plaintiff establishes a prima facie case, then the burden shifts to the employer to articulate a legitimate, non-discriminatory justification for the adverse action in order to overcome the presumption of unlawful discrimination. *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007) (citing *Thomas v. Corwin*, 483 F.3d 516, 529 (8th Cir. 2007)). If the employer provides a satisfactory reason, the plaintiff must then show that the proffered reason is a pretext for the unlawful discrimination. *Id.* Where an employee is unable to show pretext, summary judgment is appropriate. *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988).

## A.      Performance Evaluations & Unequal Pay

The defendants contend that Murry cannot show that he was meeting their legitimate expectations. Specifically, the defendants argue that it is undisputed that Murry's performance was deficient because of his communication problems, practice of discussing matters raised in staff meetings with crew members, and various other criticisms found in the annual performance evaluations. Murry, however, need only offer evidence that he was qualified for the position. *Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 846 (8th Cir. 2006), *abrogated on other grounds by Torgerson*, 643 F.3d 1031; *see also Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008); *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 875 n.3 (8th Cir. 2007) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)); *Davenport v. Riverview Gardens*

11

*Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994). The evidence that Murry had worked for Entergy Arkansas for years and that his annual performance review for his first year as an Occupations Coordinator was positive tends to establish that he was qualified. *See*, *e.g.*, *Arnold*, 471 F.3d at 846 (prong met where the plaintiff "had served as a licensed practical nurse for nearly a year before her discharge").

The defendants also contend that Murry cannot show that the poor ratings on his annual performance evaluations were given under circumstances giving rise to an inference of discrimination. To establish this prong, Murry relies upon his evidence that the defendants' reasons for giving him poor ratings on his performance evaluations are pretextual. *See Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1040 (8th Cir. 2010) (citing *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003)). Thus, the Court will hold the resolution of this question in abeyance until it considers Murry's pretext arguments. Turning to the question of whether the defendants have offered a legitimate, nondiscriminatory reason for Murry's poor ratings on his performance evaluations, the defendants point to the various criticisms within each performance evaluation. These criticisms, enumerated above, are legitimate, non-discriminatory reasons for giving Murry a "Improvement Needed" rating in each of the evaluations. *See Sanders v. Women's Treatment Ctr.*, 9 F. Supp. 2d 929, 938 (N.D. Ill. 1998) (consistently poor work performance is legitimate justification to terminate employee); *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008) ("An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action." (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc))).

12

Thus, to establish pretext, Murry must offer evidence tending to establish that the criticisms in his performance evaluations were pretexts for race discrimination.  Murry contends that the evidence tends to show that he was treated differently from similarly situated white employees. Specifically, he contends that his supervisors treated him differently on account of his race by failing to instruct Murry's white co-workers to respond to his emails and calls, and by including in his evaluations criticisms about his communication efforts while omitting such criticisms from the evaluations of his white co-workers.  *But see* Doc. #12-3 (Guy testified that he followed up on Murry's complaint by asking co-workers why they were not responding to Murry).

The problem with Murry's argument is that he fails to account for the many other criticisms on the three performance evaluations.  Murry simply does not offer evidence disputing numerous criticisms contained in the evaluations.  For example, Murry does not respond to Foret's findings, in the 2008 evaluation, that Murry failed to document or commence projects approved by Foret, failed to keep his work group appraised of his plans or location, and failed to complete safety observation forms.  Nor did Murry respond to Foret's findings that Murry was tardy to staff meetings; was minimally competent in company policies, practices, and procedures; had organizational problems; would take a long time to perform jobs which should require little effort; did not listen well to his customers; and did not know who his customers were in relation to the job.  Similarly, Murry did not dispute Harrell's findings that Murry failed to comply with certain safety rules; had problems with time management; failed to provide for needed materials and equipment for assigned crew; and had a low level of customer satisfaction.  Finally, Murry does not dispute Guy's findings that Murry failed to complete a task assigned him to rewrite some of Entergy's transmission maintenance standards, did not participate on any "ECI" projects, and did not follow up with customers.  Nor does Murry

13

offer evidence specifically disputing Guy's findings that Murry required considerable supervision or assistance on routine assignments; failed to make any suggestions to reduce costs or increase revenues; and demonstrated poor organizational skills and time management. Indeed, Murry concedes that he invoiced the wood pole inspections in an untimely fashion because he was gone on vacation and then his computer was being worked on.

Because Murry's ratings were based on his entire performance evaluations, and not just his communications problems, he cannot show that he was similarly situated to his white co-workers who refused to respond to his emails and calls for the purposes of challenging his poor ratings. *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005) ("At the pretext stage of the McDonnell Douglas burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one."), *abrogated on other grounds by Torgerson*, 643 F.3d 1031. Murry offers no evidence tending to show that his white-coworkers' performance evaluations had the same broad range of criticisms contained in his own evaluations. Additionally, the criticisms on the three evacuations regarding Murry's communication issues were not limited simply to his communications with his white co-workers. Rather, the evaluations indicate that Murry had poor writing and verbal skills, would submit emails with pictures attached but no explanation, would forward emails without commenting or providing input, would not listen well, relied solely on email to contact customers, did not follow up with customers, and used an abrupt and inappropriate tone in some of his emails. Murry does not offer evidence tending to show that his white-coworkers suffered from a similarly broad range of communications problems. *Cf. Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854-55 (8th Cir. 2012) (the plaintiff's "general allegations other employees did not receive written warnings for similar actions, or that younger, white employees with less seniority

14

were given more favorable opportunities—without specifically identifying a similarly situated employee who is not African-American—is insufficient to survive summary judgment"). The Court cannot say that Murry's white co-workers who did not respond to his emails or calls were similarly situated to him with respect to their performance evaluation ratings.

Furthermore, even if Murry could show that his white co-workers were similarly situated *vis-a-vis* the communications problems, Murry does not offer evidence that the other criticisms contained in the performance evaluations were pretextual. While Murry does deny the factual bases of some of the criticisms, or contend that the conduct did not violate company policy, Murry's denial that he engaged in unsatisfactory work performance does not alone create a genuine issue of fact. *See Ray v. Weyerhaeuser*, 17 F. Supp. 2d 867, 876-77 (W.D. Ark. 1998); *see also Johnson v. AT & T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005) ("We have recognized that the showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee."). Furthermore, some of his challenges to the criticisms in the performance evaluations are not fully substantiated by the evidence. For example, the parties make much of the criticisms in the evaluation that Murry shared information from staff meetings with crew members. Murry denies that he was told not to do so or that a written policy prohibited his actions. Nevertheless, this criticism is found in all three performance evaluations, and yet Murry does not explain why he continued to share such information with crew members after he was criticized for it by Foret in his 2008 performance evaluation. Even if his white co-workers were similarly situated to him, Murry has failed to offer evidence that the many other criticisms in his performance evaluations were pretextual. These other criticisms, considered apart from the communications issues, sufficiently justify Murry's poor ratings. *See Sanders*, 9 F. Supp. 2d at 938.

Finally, Foret both hired Murry into the T-Line department and promoted him to the position of Operations Coordinator. "It is simply incredible, in light of the weakness of [Murry]'s evidence otherwise," that the supervisor who hired and promoted him "suddenly developed an aversion to [African-Americans] less than two years later." *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 175 (8th Cir. 1992); *see also Owens v. U.S. Dept. of Army*, 312 F. App'x 831, 835 (8th Cir. 2009); *Peterson v. Scott Cnty.*, 406 F.3d 515, 522 (8th Cir. 2005); *Grossmann v. Dillard Dept. Stores, Inc.*, 109 F.3d 457, 459 (8th Cir. 1997) ("That is more than reasonable people can swallow."). Murry's attempt to avoid the "same actor" inference by distinguishing between terminating an employee and giving an employee a poor performance evaluation is frivolous; in either situation the inference cuts against the idea that a supervisor's adverse decisions were motivated by discriminatory intent.

Based upon the record as a whole, the Court concludes that no reasonable jury could find that the many criticisms contained in Murry's sub-par performance evaluations in 2008, 2009, and 2010 were a pretext for giving him poor ratings because he is African-American. The defendants are entitled to summary judgment with respect to Murry's disparate treatment claim based on his poor performance evaluations. Furthermore, it is undisputed that, pursuant to company policy, Murry could not receive merit-based raises for those years he was rated as "Needs Improvement." Consequently, the defendants are also entitled to summary judgment on Murry's disparate treatment claim based on unequal pay.

## B.     Transfer to Entergy Services

Murry contends that his transfer from Entergy Arkansas to Entergy Services was the result of intentional discrimination. The parties spar over whether the transfer was a demotion. The defendants contend that the transfer was not a demotion because it did not involve a change in work

16

location or diminution in pay. *See Wedow v. City of Kan. City, Mo.*, 442 F.3d 661, 671 (8th Cir. 2006) (" 'Mere inconvenience without any decrease in title, salary, or benefits' or that results only in minor changes in working conditions does not meet this standard." (quoting *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005))). Murry contends that the transfer was a demotion because he lost opportunities for overtime, lost the privilege to use a company vehicle, and lost promotional opportunities because there is no clear path to promotion in his new department.[3] "A transfer constitutes an adverse employment action when the transfer results in a significant change in working conditions or a diminution in the transferred employee's title, salary, or benefits." *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir. 2000). It is undisputed that Murry commutes from Pine Bluff to Little Rock—cities that are about 45 miles apart—on a daily basis. Thus, as a direct result of the transfer, Murry lost his privilege to use a company vehicle and became responsible for the expenses of a lengthy daily commute. The Court cannot say as a matter of law that this is not a significant change in benefits. Furthermore, the defendants do not dispute Murry's testimony that he did not have overtime opportunities in his new position. Doc. #26-3. Denial of overtime hours is an adverse employment action. *See Lloyd v. City of St. Charles*, 4:07CV01935 JCH, 2009 WL 485078 (E.D. Mo. Feb. 26, 2009) (collecting cases), *aff'd*, 360 F. App'x 713 (8th Cir. 2010). The Court concludes that Murry has offered evidence tending to establish that his transfer to Entergy Services was an adverse employment action.

---

[3] Murry also testified that he had supervised crews while an Operations Coordinator at Entergy Arkansas, but that he did not supervise anyone at Entergy Services. The defendants point to testimony that an Operations Coordinator did not truly supervise the crews because such a position had no authority to direct any crew members works. Regardless, Murry does not rely upon this testimony in support of his claim that the transfer was a demotion.

However, Murry fails to provide evidence tending to establish that his transfer occurred under circumstances giving rise to an inference of discrimination. Murry relies solely upon evidence regarding Foret and Harrell's racial discrimination in drafting his 2008 and 2009 performance evaluations.[4] However, it is undisputed that the decision to transfer Murry was made by Entergy Services's new Vice President, Vaughn, after conferring with Hartwick, the Grid Manager in Arkansas. Murry points to no evidence that Vaughn or Hartwick harbored any discriminatory animus. Murry contends that Foret and Harrell may have tainted the transfer decision by giving Murry bad performance reviews. However, Murry points to no evidence that Vaughn choose Murry for the newly created position because of his poor performance reviews. In fact, Murry's poor evaluations caused Vaughn to initially express concern about selecting Murry for the new position. Only after Hartwick pointed out that Murry had an advance degree did Vaughn decide to select Murry. Therefore, there is no evidence that Vaughn's decision to select Murry was a result, either immediately or in a mediated way, of discriminatory animus. Consequently, the defendants are entitled to summary judgment on Murry's claim that he was transferred to Entergy Services because of race discrimination.

## C.    Domicile Change & Relocation Benefits Requests

Murry contends that the defendants discriminated against him by denying his request to change his work location from Entergy's Little Rock office to the Pine Bluff office. The decision to deny Murry's request was made by John Scott, who is Guy's supervisor. Guy, however, recommended that Murry's request be denied. To establish an inference of discrimination, Murry

---

[4] Murry's 2010 performance evaluation, authored by Guy, covered the first year Murry spent at Entergy Services, after the transfer.

relies solely upon the evidence regarding the poor rating which Guy gave Murry in his 2010 performance evaluation. However, Guy testified that Scott informed him that no domicile change requests would be approved unless it served a business purpose. Doc. #12-3. Guy further testified that changing Murry's work location to Pine Bluff would not only *not* serve a business purpose, but also would be detrimental because Entergy's Arkansas transmission customers are located in Little Rock. *Id.* Murry offers no evidence tending to contradict this testimony or establish that the explanation was pretextual. The defendants are entitled to summary judgment on this claim.

Murry also requested relocation assistance to help cover the costs of his commute. Murry contends that he was eligible for relocation assistance based on his testimony that he spoke with a human resources representative, Diane Harris, who told him that he was qualified to receive relocation benefits based on the policy and Murry's response to a number of questions. Nevertheless, under the express terms of Entergy's relocation policy, Murry is *not* eligible for relocation benefits because he did not change residences or work locations. *See* Docs. #12-18, #25. Even assuming that Murry's testimony about Harris's statement to him that his was eligible for relocation benefits could overcome the express terms of the policy, Murry has failed to point to any evidence that the defendants' explanation that Murry's request was denied because he did not satisfy the policy's eligibility requirements was a pretext for race discrimination. *See Johnson*, 422 F.3d at 763 ("We have recognized that the showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee."). The defendants are entitled to summary judgment on this claim.

19

## IV.

Murry also alleges that the defendants retaliated against him for complaining about race discrimination by demoting him and denying his requests for change of domicile and relocation benefits. *See* Doc. #1. In the absence of direct evidence, the *McDonnell Douglas* burden-shifting framework also governs retaliation claims. *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1050 (8th Cir. 2007). To establish a prima facie case, a plaintiff must show that: (1) he engaged in protected conduct; (2) a reasonable employee would have found the challenged action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Id.*

Although Murry did file a complaint against Foret with Entergy's ethics hotline in December of 2009, this complaint was filed after Vaughn and Hartwick selected Murry for the new transmission position in Entergy Services. Thus, Murry cannot establish that his transfer was caused by his subsequent complaint. However, Murry relies on Foret's testimony that, well before the transfer decision was made, he was told informally by other employees that Murry had threatened to file a complaint against him and to sue Entergy. Nevertheless, as stated above, Murry points to no evidence that Vaughn choose Murry for the newly created position because of his poor performance reviews. Nor does Murry point to any evidence that Vaughn or Hartwick were aware of Murry's threat to file a complaint against Foret and sue Entergy. Consequently, even if Murry's comments to other employees constituted protected conduct, he offers no evidence causally linking his complaints to the transfer decision. *Cf. Phillips v. Matthews*, 547 F.3d 905, 911 (8th Cir. 2008).

Murry also contends that the decisions to deny his requests to change his work location or receive relocation assistance were made in retaliation for his ethics hotline complaint because a "close temporal connection exists" between his complaint and the denials. Assuming that Murry could

establish a prima face case of retaliation based on a "very close" temporal connection, *see Zhuang v. Datacard Corp.*, 414 F.3d 849, 856 (8th Cir. 2005); *but see Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008), Murry nevertheless has failed to offer evidence tending to establish pretext. As discussed above, Guy's undisputed testimony demonstrates that Scott had told him that only transfers that served a business purpose would be permitted and that Guy believed that transferring Murry to the Pine Bluff office would harm Entergy's business purposes. Similarly, Murry is not eligible for relocation benefits pursuant to the express provisions of Entergy's relocation policy.

Therefore, the defendants are entitled to summary judgment on Murry's retaliation claims.[5]

## CONCLUSION

For the foregoing reasons, Entergy Arkansas and Entergy Services's motion for summary judgment is GRANTED. Doc. #12. Kenneth Murry's complaint is dismissed with prejudice.

---

[5] In his brief, Murry indicates that he is also asserting a retaliation claim against Harrell for giving Murry a poor performance evaluation after Murry made his ethics hotline complaint. However, Murry's complaint lacks any allegation that Harrell gave Murry a poor performance evaluation in retaliation for Murry's ethics hotline complaint. Murry may not amend his complaint by asserting new allegations in his summary judgment motion. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (citing *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996))). Similarly, in his brief, Murry states that Guy gave Murry a poor performance evaluation after Murry filed an ethics hotline complaint against Guy on January 20, 2010. However, Murry's complaint is devoid of any allegation that he filed an ethics complaint in 2010 against Guy or, more importantly, that Guy gave Murry a poor performance evaluation in retaliation for Murry's ethics complaint. Furthermore, the 2010 performance evaluation was finalized in March of 2011; well over one year after Murry's purported 2010 ethics hotline complaint. *See*, *e.g.*, *Nelson v. J.C. Penney Co., Inc.*, 75 F.3d 343, 346 (8th Cir. 1996) (one month between protected activity and adverse employment action insufficient, without more, to establish causality).

IT IS SO ORDERED this 27th day of June, 2012.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE